United States District Court
for the
Southern District of Florida

| | |
|---|---|
| In the matter of the Complaint of TAMER GOZLEVELI and FARIDEH GOZLEVELI, as owners of a 2012 11' Sea-Doo Bombardier 21CA, Hull Identification Number YDV22280B212, for exoneration from or limitation of liability, Petitioners/Counter-Defendants<br><br>v.<br><br>KAREN KOHNKE, Respondent/Counter-Claimant/Third Party Plaintiff,<br><br>v.<br>AYDIN GOZLEVELI, Third Party Defendant. | Case No. 12-61458-CV-Scola |

## **Verdict and Order Following Non-Jury Trial**

This case began with a complaint filed by Tamer and Farideh Gozleveli for exoneration from or limitation of liability from injuries suffered by Claimant Karen Kohnke after she was involved in an accident involving a jet-ski owned by the Gozlevelis. (Compl., ECF No. 1.) The Court granted summary judgment in favor of Farideh and Tamer finding that there was no evidence of negligence by them as owners, and no evidence that their son, Aydin Gozleveli, was their representative regarding who could operate their jet skis. (Order, ECF No. 81). Kohnke appealed the order granting summary judgment, and the 11th Circuit Court of Appeals affirmed, concluding that "Kohnke cannot show that Tamer and Farideh were in any way negligent." Because the Court previously granted summary judgment in favor of Aydin Gozleveli on Kohnke's claim of negligence per se, the trial only involved Karen Kohnke's claim of negligent entrustment against Aydin. (Order, ECF No. 118).

On June 22 and 23, 2015, the Court held a non-jury trial on Kohnke's negligence claim, which was tried under a theory of negligent entrustment. (3d Party Compl. ¶¶ 43–50, ECF No. 9.) The parties submitted joint stipulated facts, as well as proposed findings of fact and conclusions of law, which the Court has carefully reviewed. After considering the credible testimony and evidence, and the applicable law, the Court finds that Aydin Gozleveli negligently entrusted Kohnke with the subject jet ski. Further, the Court finds that Kohnke was comparatively negligent—Aydin is 60% responsible for the accident and Kohnke is 40% responsible for the accident.

**A. Findings of Fact**

In February of 2012, Tamer and Farideh Gozleveli, purchased two new 2012 11' Sea-Doo Bombardier personal watercrafts (PWC). Tamer and Farideh Gozleveli were the only owners of the PWCs. The Gozleveli's son, then 26 year-old Aydin, met Kohnke, a then 42 year-old woman while socializing with friends on February 29, 2012. The following day—March 1, 2012—around noon, Aydin's friend, Ryan De la Nuez, and Kohnke went to Aydin's parents' home where Aydin lived. Aydin and Ryan were experienced PWC operators and both had extensively ridden different models of PWCs previously owned by Farideh and Tamer. Before departing the Gozleveli home, Kohnke told Ryan and Aydin that she had no experience operating or riding PWCs. Aydin told Ryan that Kohnke did not have permission to operate the PWC. Prior to departing the dock, Aydin gave Ryan a tutorial as to the basic operation of the new PWCs. One unique feature of these particular PWCs is their braking system. Aydin showed Ryan how to operate the brake. Though Kohnke was present in the general area during the tutorial, the Court finds insufficient evidence to indicate she heard or paid attention to the tutorial.

At approximately 1:00 p.m., Aydin boarded one PWC, and Ryan boarded the other PWC with Kohnke as a passenger behind him. Ryan and Aydin operated the PWCs south through the Intracoastal Waterway in Fort Lauderdale, Florida, to the Atlantic Ocean. While in the ocean, they operated the PWCs at various speeds. After approximately three hours of operation, the group returned to the Intracoastal Waterway. Ryan offered Kohnke the opportunity to operate the PWC and she readily accepted the offer. Kohnke began operating the PWC near the entrance to the Intracoastal Waterway. The subject PWC had various warning labels which warned the operator of dangers of its operation including advising operators to operate at a safe speed, and to not release the throttle when attempting to steer, and to constantly scan the area to avoid collision, and to take early action to avoid collisions, among

others.  These labels were located directly below the PWC's operator in an area easily observable by any operator.  Kohnke did not read the warning labels.  Kohnke did not request instruction from either Aydin or Ryan on how to operate the PWC, although Kohnke had observed Ryan operating the PWC for nearly three hours.

Aydin was initially unaware that Kohnke took over operation of the PWC.  However, Aydin observed Kohnke operating the PWC after the group arrived from the Intracoastal to English Park.  Though he was upset with Ryan for allowing Kohnke to operate the PWC, he never told Ryan to take over the operation of the PWC.  Aydin testified that he witnessed Kohnke performing maneuvers, including turns, figure-eights, and stopping.  He also testified that he witnessed Ryan—still seated behind Kohnke—manipulate the steering mechanism of the PWC at certain times while Kohnke was operating in the Park.  From the beginning of the Intracoastal Waterway to English Park, Kohnke merely followed Aydin at a no-wake speed.  But at English Park she was able to operate the PWC freely and make stops and turns at her discretion for 15 to 45 minutes.

Aydin never gave any instructions to Kohnke on the safe operation of the PWC and never asked Ryan if he had given her instructions.  This is significant because even though Aydin knew Ryan had significant experience on PWCs, Aydin still gave Ryan a tutorial on the PWC and its features before he allowed Ryan to use it.  Neither Ryan nor Aydin ever informed Kohnke that it was necessary to apply the throttle in order to turn the PWC.  The PWCs included a "learning key," which Aydin testified that he was aware existed and admitted that Kohnke should have been using.  The learning key would have not only restricted the speed of the PWC to 25 mph, but also would have prevented sudden acceleration.  Aydin eventually told Kohnke to follow him home by traveling north via the Intracoastal Waterway.

During the trip home from English Park, Aydin operated his PWC at no-wake speed in compliance with posted no-wake zones.  After traveling through a narrow pass under a bridge just before Birch State Park, Aydin waited for Kohnke to navigate through the pass and then continued north towards the Gozleveli home.  After passing Birch State Park the no-wake zone ended and the group entered a portion of the Intracoastal where crafts smaller than 25 feet are allowed to travel 25 mph.  Kohnke attempted to follow Aydin but at approximately 5:00 p.m., she lost control of the PWC and crashed into a fixed dock located near 2200 Intracoastal Drive, Fort Lauderdale, Florida.  Kohnke testified that the cause of the incident was her failure to give the PWC throttle while turning but a computer printout of the engine's performance introduced as evidence during trial indicates that in the last 5 seconds before the crash,

Kohnke significantly increased the RPMs, which is consistent with giving the PWC increased throttle.

As a result of the incident, Kohnke sustained severe injuries to her left shoulder and her left ankle; suffered punctured lungs, and fractures to her humerus and pelvis, and required debridement surgery to her hip.  She spent one month in a Broward hospital followed by a month in an assisted living facility.

The figure on the following page approximates the location of the major landmarks of the group's route.



### B. Conclusions of law

#### a. Jurisdiction, venue, and applicable law

This matter falls under the admiralty and maritime jurisdiction of this Court pursuant to Federal Rule of Civil Procedure Rule 9(h). The general maritime law of the United States applies to this case—general maritime law is drawn from state and federal sources and is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules. *Misener Marine Cosntr., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 837–38 (11th Cir. 2010)(citing *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986)). Absent a federal liability scheme, the governing substantive law in an admiralty action is drawn from common law tort principles which comport with the tenets of maritime law. *Diesel Repwoer, Inc. v. Islander Incs., Ltd.*, 271 F.3d 1318, 1323–24 (11th Cir. 2001); *Favorito v. Pannell*, 27 F.3d 716, 719 (1st Cir. 1994). Ultimately, federal common law supersedes a particular state law formulation with which it conflicts. *Id.*

#### b. Aydin negligently entrusted Kohnke with the PWC

At trial, Kohnke presented a theory of negligent entrustment—essentially she argued that Gozleveli knew she had no experience but allowed her to operate the PWC, a vessel he supplied for the excursion. Negligent entrustment is defined as:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Seale v. Ocean Reef Club, Inc.*, No. 13-21515-CIV, 2013 WL 4647218, at *7 (S.D. Fla. Aug. 29, 2013) (Altonaga, J.) (quoting *Kitchen v. K-Mart,* 697 So.2d 1200, 1202 (Fla. 1997) (quoting Restatement (Second) of Torts § 390)). "[F]oreseeability of harm, rather than ownership, determine[s] whether an action exist[s] for negligent entrustment." *Kitchen,* 697 So.2d at 1205 (citation omitted). In other words, liability is not predicated upon *ownership* of the item entrusted to another but rather upon "whether the harm was or should have

been foreseeable by the person entrusting or delivering the [the item] to another." *Seale*, 2013 WL 4647218 at *7 (quoting *Williams v. Bumpass,* 568 So.2d 979, 981 (Fla. 5th DCA 1990)).

This Court already determined that Farideh and Tamer owned the PWCs, but Aydin was allowed to control the PWCs and supply them to his friend Ryan, and other selected, approved friends for use. Moreover, potential physical harm was a foreseeable risk that Aydin not only should have—but did— anticipate might occur if someone inexperienced used the PWCs. Aydin testified that he spent extensive time training to use PWCs and even completed a water safety course. He was also familiar with the purpose of the learning key and testified that his family used the learning key when they first began driving PWCs. Therefore, Aydin was aware that PWCs require familiarity and skill and have the potential for physical harm. Aydin knew or "had reason to know" that there was a risk of physical harm because of Kohnke's inexperience. Yet, Aydin—admittedly—"tacitly approved" Kohnke's operation of the PWC when he saw her operating the PWC but did not tell her to change places with Ryan or provide her any type of warning or tutorial for proper and safe use of the PWC.

As a general rule, the notion of entrustment is predicated on permissive use of the entrustor's vehicle by the entrustee. Permission may be either express or implied. For purposes of negligent entrustment analysis, implied permission to use a vehicle exists when a course of conduct or relationship between the parties includes a mutual acquiescence or lack of objection under circumstances signifying permission or the giving of consent. 23 Causes of Action 2d 265 (Originally published in 2003) (citing *LeCave v. Hardy*, 73 S.W.3d 637 (Mo. Ct. App. E.D. 2002)). The evidence presented at trial established that Aydin gave Kohnke implied permission to operate the PWC when he saw her on the PWC but failed to object or tell her to stop operating it.

The evidence also established that Aydin was negligent in failing to provide Kohnke any type of instruction and/or warning prior to her operating the PWC; allowing Kohnke to operate the PWC without the learner's key; and entrusting the PWC to an inexperienced operator. The learning key would have prevented the PWC from traveling faster than 25 mph, would have reduced the sudden acceleration that occurred two seconds before impact, thereby lessening the damages to Kohnke, or it would have allowed her more time to steer away from the dock to avoid the impact, or both.

Aydin knew or should have known Kohnke would use the PWC in a manner involving an unreasonable risk of physical harm to herself and others because of her inexperience, the lack of instructions, and the lack of learner's key. Although he saw Kohnke operating the PWC in English Park, he also saw

that, at times, Ryan had to reach forward and control the PWC, demonstrating to Aydin that she was doing something incorrectly. Nonetheless, he allowed her to continue operating the PWC. Aydin also never instructed Kohnke that throttle was needed to turn a PWC—something that is counter-intuitive to even the most experienced operators of cars and other motorized devices. Aydin also did not ensure that Kohnke could distinguish between the brake and the throttle to ensure that she did not press the wrong lever in an emergency situation. Thus, Aydin is subject to liability for the physical harm resulting from Kohnke's use of the PWC. *Seale*, 2013 WL at *9.

### c. Kohnke was comparatively negligent when she drove the PWC

Although the Court finds that Aydin negligently entrusted Kohnke with the PWC, Kohnke is not free from fault. The accident was reasonably foreseeable to Aydin but Kohnke's actions contributed to the damages sustained. Aydin included comparative fault as his second affirmative defense. (Answer 6, ECF No. 15.); *Philip Morris USA, Inc. v. Arnitz*, 933 So. 2d 693 (Fla. 2d DCA 2006) (noting that comparative fault must be raised as an affirmative defense.)

### 1. Comparative negligence in maritime law

Maritime law recognizes the doctrine of comparative negligence, including in personal injury cases. *Holderbaum v. Carnival Corp.*, No. 13-cv-24216, 2015 WL 728362, at *12 (S.D. Fla. Feb. 19, 2015) (Lenard, J.) (citing *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975)). Comparative negligence is a theory of negligence where the plaintiff is entitled to damages even if he or she is found to be more at fault than the defendant, but damages awarded will be reduced by percentage of fault attributable to plaintiff. *See Gorday v. Faris*, 523 So.2d 1215, 1219 (Fla. 1st DCA 1988).

Any assumption of risk in admiralty, "whatever its scope must be applied in conjunction with the established admiralty doctrine of comparative negligence." *Edward Leasing Corp. v. Uhlig & Assocs., Inc.*, 785 F.2d 877, 886 (11th Cir. 1986) (citing *Tiller v. Atlantic Coast Line R.R. Co.*, 318 U.S. 54 (1942)). Under admiralty comparative negligence doctrine, "contributory negligence, however gross, is not a bar to recovery but only mitigates damages." *Id.*

## 2. First-party negligent entrustment

At first blush, comparative negligence in a negligent entrustment case seems counter-intuitive—had Aydin not negligently entrusted the PWC to Kohnke, there would have been no accident, end of story.  But maritime law follows a pure comparative negligence theory; other jurisdictions that follow a system of pure comparative fault rely on Restatement (Second) of Torts § 390 to conclude that a plaintiff may bring a first-party negligent entrustment claim against the entrustor, where the facts show that the plaintiff was negligent.  *See Gorday,* 523 So.2d at 1219; *Martell v. Driscoll*, 302 P.3d 375, 382 (Kan. 2013); *Blake v. Moore*, 162 Cal. App. 3d 700 (Cal. 5th DCA 1984).  Section 390 states that someone who supplies a chattel to another whom the supplier knows, or has reason to know, to be likely to use it in a manner involving unreasonable risk of physical harm to himself and others is subject to liability.  Comment c of § 390 notes that one who accepts and uses a chattel knowing that he is incompetent to use it safely will usually be in such contributory fault as to bar recovery.  *See* 12 A.L.R. 4th 1062 Negligent Entrustment: Bailor's Liability to Bailee (1982).  But where a jurisdiction employs a comparative fault theory rather than contributory fault, the fact finder is tasked with apportioning percentage of fault of liability rather than holding that the entrustee is completely barred from recovery.  *See, e.g., Gorday,* 523 So.2d at 1219; *King v. Petefish*, 541 N.E.2d 847, 855 (Ill. 4th DCA 1989); *Martell,* 302 P.3d at 382.

First-party negligent entrustment comparative fault cases often arise where a car is loaned to a driver that the entrustor knows is incompetent but where the entrustee also knows, or should know, that they are incompetent to drive.  For example, Florida courts have concluded that a first-party negligent entrustment theory may be pursued in conjunction with comparative negligence where the evidence established negligence on the part of the plaintiff in consciously deciding to take control of the vehicle, even though he knew he was in no condition to drive.  *Gorday,* 523 So. 2d at 1219.  It was appropriate to weigh and consider that evidence under comparative negligence principles, in relation to the evidence which tended to establish negligence on the part of the defendant who turned the car over to one whose faculties he either knew or should have known were impaired by drinking.  *Id.*  The Court found that it was appropriate to weigh the evidence of the negligence of the passenger who consciously decided to take control of the vehicle even though he knew that he was intoxicated and in no condition to drive.

Here, it is proper to consider Kohnke's comparative negligence.  Kohnke testified that she was scared of the PWCs, that she did not feel comfortable

even riding a PWC, and that she asked to be let off at the beach because she was so distressed to be riding the PWC. She clearly was aware that PWCs require training and experience and knew of her limitations, yet she decided to drive the PWC endangering not only herself but her passenger as well.

### 3. Kohnke negligently operated the PWC

Negligence generally requires a duty and a breach of duty, and that the breach was the proximate cause of the injury, and damages. *See Hasenfus v. Secord*, 962 F.2d 1556, 1559–60 (11th Cir. 1992). Kohnke had a duty to operate the PWC in a safe manner and avoid an accident. Significant evidence was presented at trial that demonstrated Kohnke breached that duty.

The evidence presented at trial shows that although Kohnke testified that she was scared of the PWCs, she did not refuse to drive and accepted the invitation from Ryan to drive—in other words, she did not feel comfortable with the PWC yet still decided to operate and control the PWC. She also did not ask for instructions or directions from her passenger Ryan, despite Ryan's experience with PWCs. Moreover, evidence presented at trial demonstrated that she operated the PWC for over an hour giving her more time to see the warning labels on the PWC and thus more time to ignore them. This also gave her more time to have some familiarity with the PWC's operation, its power, and its braking system.

The manner in which Kohnke operated the PWC was negligent. When she was driving back to the Gozleveli home and following Aydin, her response to Aydin's increased speed was negligent—she was negligent for continuing to follow Aydin and for speeding up to keep up with him. Kohnke could have stopped following Aydin, waited for him to notice and come back, or simply asked Ryan, who was very familiar with the area, for directions. Or, she could have asked Ryan to begin operating the PWC again. The crash—although reasonably foreseeable by Aydin—was caused at least in part by Kohnke's own negligence. Kohnke's lack of memory concerning the details in the moments prior to the crash make it difficult for the Court to determine the precise mechanisms that caused the crash. But, the crash was caused by either her panicking and pressing the throttle instead of the brake, or by her failing to slow down and/or turn in sufficient time before the allision with the dock. It also appears that despite her testimony that had she known she had to engage the throttle to turn she would not have crashed, the computer printout of the engine's performance indicates Kohnke *was* using the throttle during the sixty seconds preceding and up until the accident.

The Court has tried to credit Kohnke's purported lack of memory, but clearly she was dishonest about several key events.  First, Kohnke testified that she and Ryan attempted to exchange life vests in order to allow her to wear the vest to which the key was attached.  Ryan testified that this exchange did not happen and that there was no conversation about exchanging life vests.  Second, Kohnke testified that she was "instructed" by Aydin to drive the PWC—both Aydin and Ryan testified that Karen was not told to drive.  Third, Kohnke testified that she did not remember whether the PWC had a brake, but evidence presented at trial indicated that Kohnke had been using the brake throughout the hour-plus time that she spent operating the PWC.  Most indicative of Kohnke's negligence—and dishonesty—is her testimony that did not read the warning labels.  Kohnke testified that if an owner's manual had been made available to her she would have read it in its entirety because she's "a nerd like that."  Inexplicably, when similar information was available right between her legs she failed to read it.

Kohnke was also evasive on the stand about her past and present employment, which goes to her overall credibility.  But since she has withdrawn her claims about past wages that topic is not relevant for damages.

### C. Damages

Kohnke seeks monetary damages representing (1) past medical bills in the amount of $130,873.61; (2) past pain and suffering, disfigurement, inconvenience, and loss of enjoyment of life in the amount of $500,000.00 and (3) future pain and suffering, disfigurement, inconvenience, and loss of enjoyment of life in the amount of $25,000.00 per year for the remainder of Kohnke's expected 36 years of life ($900,000.00).  Thus, Kohnke seeks a total of $1,530,873.61.

At trial, Aydin did not object to Kohnke's past medical bills, which totaled $130,873.61.

The undisputed evidence established that Kohnke suffered severe injuries to her hip, shoulder, pelvic region, and ankle, which required several surgeries, one month hospital stay, and one month in a rehabilitation center.  She still suffers on a daily basis from these injuries and will continue to suffer for the rest of her life.  She has several disfiguring scars on her thighs, hip, and ankle.  She has permanent screws and a pin in her ankle and a permanent plate with nine screws in her shoulder.  She suffers daily pain and discomfort, lack of stability walking, and looseness in her shoulder.  All of these conditions are reasonably anticipated to continue, if not worsen, for the rest of her life.  The Court accepts Kohnke's testimony that she was healthy and physically

active before the accident and is severely restricted in her activities since the time of the accident. Therefore, the Court finds Kohnke is entitled to $130,873.61 for past medical expenses; $350,000 for past pain and suffering, disfigurement, inconvenience, and loss of enjoyment of life; and $900,000 for future pain and suffering, disfigurement, inconvenience, and loss of enjoyment of life. The Court finds the total damages are **$1,380.873.61**.

### D. Apportionment

The Court recognizes that as the fact finder in this first-party, negligent-entrustment case it must compare Aydin's fault with Kohnke's. But allocating liability in a first-party, negligent-entrustment case is conceptually difficult. On one hand, the person entrusted with a vessel, in this case Kohnke, is responsible for accepting and using the vessel knowing that that she was not competent to do so. Some jurisdictions go so far as to effectively ban first-party, negligent-entrustment claims. *See, e.g., Meachum v. Faw*, 436 S.E. 2d 141, 144 (1993) ("[W]e hold that a bailee may bring an action for negligent entrustment against the bailor but that such an action is subject to the defense of contributory negligence."). On the other hand, the essence of a negligent-entrustment claim is the negligence of the person entrusting an incompetent user with a vessel. Some might argue that it is unfair to allow that person to shift the blame to the incompetent user when it was his negligence that started the unfortunate but foreseeable chain of events. The equitable solution is to compare and allocate fault between Aydin and Kohnke, keeping in mind that this is a first-party, negligent-entrustment case and evaluating it in light of the specific facts of this case. Based on the reasoning above, the Court finds that Aydin was **60%** at fault and the Court finds that Kohnke was **40%** at fault.

### E. Conclusion

Accordingly, the Court finds that Aydin negligently entrusted the PWC to Kohnke and is 60% at fault. The Court also finds that Kohnke negligently operated the PWC and is 40% at fault. The Court therefore awards Kohnke a total of **$828,524.00**.

**Done and ordered** in chambers, at Miami, Florida, on June 25, 2015.

_____
Robert N. Scola, Jr.
United States District Judge